1  MICHAEL J. HADDAD (State Bar #189114)
   JULIA SHERWIN (State Bar #189268)
2  TERESA ALLEN (State Bar #264865)
   HADDAD & SHERWIN LLP
3  505 Seventeenth Street
   Oakland, CA 94612
4  T: (510) 452-5500
   F: (510) 452-5510
5  Attorneys for all Plaintiffs

6                    **UNITED STATES DISTRICT COURT**

7                    **NORTHERN DISTRICT OF CALIFORNIA**

8  DANIEL RUIZ, DECEASED, by and through his Co-        Case No: 21-01832 JD
   Successors in Interest, SANTOS RUIZ, FERNANDO VERA,
9  VANESSA ROBINSON, and DANIEL RUIZ, JR., as Co-       Hon: James Donato
   Successors in Interest and individually; and ANGELINA
10 CHAVEZ, Individually
                                                        **FIRST AMENDED COMPLAINT**
11              Plaintiffs,                              **FOR DAMAGES AND,**
                                                        **DECLARATORY RELIEF, AND**
12 vs.                                                  **DEMAND FOR A JURY TRIAL**

13 STATE OF CALIFORNIA; CALIFORNIA DEPARTMENT
   OF CORRECTIONS AND REHABILITATION (CDCR), an
14 agency of the State of California; SAN QUENTIN STATE
   PRISON, a CDCR state prison; RALPH DIAZ, former
15 Secretary of CDCR, in his individual capacity; ESTATE OF
   ROBERT S. THARRATT; RONALD DAVIS, Warden of
16 San Quentin State Prison, in his individual capacity;
   RONALD BROOMFIELD, Acting Warden of San Quentin
17 State Prison, in his individual capacity; CLARENCE
   CRYER, Chief Executive Officer of San Quentin State
18 Prison, in his individual capacity; ALISON PACHYNSKI,
   M.D., Chief Medical Executive of San Quentin State Prison,
19 in her individual capacity; SHANNON GARRIGAN, M.D.,
   Chief Physician and Surgeon of San Quentin State Prison, in
20 her individual capacity; LOUIE ESCOBELL, R.N., Health
   Care Chief Executive Officer of California Institute for Men
21 (CIM), in his individual capacity; MUHAMMAD FAROOQ,
   M.D., Chief Medical Executive for CIM, in his individual
22 capacity; KIRK TORRES, M.D., Chief Physician & Surgeon
23 for CIM, in his individual capacity, and DOES 1 through 20,
   individually, jointly and severally, and MONICA RUIZ,
24 Individually, a nominal Defendant,

25              Defendants.

26

27

28

Plaintiffs, by and through their attorneys, HADDAD & SHERWIN LLP, for their First Amended Complaint against Defendants, state the following:

## JURISDICTION

1.     This is a civil rights, wrongful death/survival action, arising from Defendants' deliberate indifference to the Decedent DANIEL RUIZ's safety and serious medical needs, resulting in the death of DANIEL RUIZ on July 11, 2020.  This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)-(4) because it is being brought to obtain compensatory and punitive damages for the deprivation, under color of state law, of the rights of persons in the United States that are secured by the United States Constitution, pursuant to 42 U.S.C. §§ 1983 and 1988.  This action is brought pursuant to the First, Eighth, and Fourteenth Amendments to the United States Constitution, the Americans with Disabilities Act ("ADA") – 42 U.S.C. § 12132 and 28 C.F.R. §35, et seq., the Rehabilitation Act ("RA") – 29 U.S.C. § 794, et seq., and the laws and Constitution of the State of California.  Plaintiffs further invoke this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367 (a), to hear and decide claims arising under state law.

2.     Venue in this judicial district is proper, pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events, actions, and/or omissions giving rise to the claims occurred at San Quentin State Prison, in the County of Marin, California.

## INTRADISTRICT ASSIGNMENT

3.     This matter is properly assigned to the San Francisco or Oakland Division of this Court.

## PARTIES AND PROCEDURE

4.     Plaintiffs SANTOS RUIZ, FERNANDO VERA, VANESSA ROBINSON, and DANIEL RUIZ, JR., are citizens of the United States, competent adults, and are children of DANIEL RUIZ (hereafter "MR. RUIZ"), Deceased.  Plaintiffs SANTOS RUIZ, FERNANDO VERA, VANESSA ROBINSON, and DANIEL RUIZ, JR. are proper successors in interest to DANIEL RUIZ, pursuant to California Code of Civil Procedure § 377.11.  Plaintiffs SANTOS RUIZ, FERNANDO VERA, VANESSA ROBINSON, and DANIEL RUIZ, JR. bring these claims individually and as Co-Successors in Interest for DANIEL RUIZ, Deceased, and the claims are brought pursuant to California Code of Civil Procedure sections 377.20, et seq. and 377.60, et seq., which provide for survival and wrongful death

actions.  The survival and wrongful death claims all survive the death of DANIEL RUIZ; all arise from the same wrongful act or neglect of another; and such claims are properly joined pursuant to California Code of Civil Procedure § 377.62.  The claims set forth below are also brought by SANTOS RUIZ, FERNANDO VERA, VANESSA ROBINSON, and DANIEL RUIZ, JR., individually and on behalf of Decedent DANIEL RUIZ on the basis of 42 U.S.C. §§ 1983 and 1988, the United States Constitution, the Americans with Disabilities Act (ADA) and Rehabilitation Act (RA), and federal and state civil rights law.

5.      Plaintiff ANGELICA CHAVEZ is the mother of Decedent, DANIEL RUIZ, and a resident of the State of California.  Plaintiff ANGELICA CHAVEZ brings these claims individually for wrongful death pursuant to California Code of Civil Procedure § 377.60, and individually for violation of her personal rights under the United States Constitution and state law.  At the time of Decedent's death, Plaintiff ANGELICA CHAVEZ was dependent on the Decedent, her son, relying on Decedent for financial and other support.

6.      All Plaintiffs also bring these claims as Private Attorneys General to vindicate not only their rights but others' civil rights of great importance.

7.      At all material times, Defendant STATE OF CALIFORNIA employed all individual Defendants in this action, and all individual Defendants acted within the course and scope of their employment.  Defendant STATE OF CALIFORNIA is properly named as a Defendant for Plaintiffs' disability discrimination claims under the ADA and the RA.

8.      At all material times, Defendant CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION ("CDCR"), was an agency of the State of California.

9.      At all material times, Defendant SAN QUENTIN STATE PRISON ("SAN QUENTIN") was a State of California prison under CDCR.

10.     At all material times, Defendant RALPH DIAZ was the State of California Secretary, and highest policymaking official, of CDCR.  On information and belief, he was ultimately responsible for the oversight, management, policies, procedures, provision of services, and supervision of all employees and agents of CDCR, including employees and agents of SAN QUENTIN, the California Institute for Men ("CIM") and all other prisons under CDCR's authority, including in relation to preventing and handling

contagious disease outbreaks at SAN QUENTIN.  On information and belief, he was personally involved in the decision(s) to send CIM inmates to San Quentin in May, 2020, the manner in which that inmate transfer was done, and the manner in which officials caused, addressed, or failed to address the COVID-19 outbreak at SAN QUENTIN.  At all material times, he was employed by the State of California, and acted within the course and scope of that employment.

11. Defendant ESTATE OF ROBERT S. THARRATT succeeds for R. STEVEN THARRATT, M.D. after his death.  At all material times, R. STEVEN THARRATT, M.D., as ROBERT S. THARRATT was professionally known, was the Medical Director and a policymaking official of CDCR who, on information and belief, was responsible for medical-related oversight, management, decisions, policies, procedures, provision of services, hiring and supervision of CDCR employees and agents, and for preventing and handling contagious disease outbreaks at SAN QUENTIN.  On information and belief, he was personally involved in the decision(s) to send CIM inmates to San Quentin in May, 2020, the manner in which that inmate transfer was done, and the manner in which officials caused, addressed, or failed to address the COVID-19 outbreak at SAN QUENTIN.  At all material times, he was employed by the State of California, and acted within the course and scope of that employment. Defendant ESTATE OF ROBERT S. THARRATT is being substituted in for Defendant R. STEVEN THARRATT, M.D., deceased.

12. At material times, Defendant RONALD DAVIS was the Warden of SAN QUENTIN.  On information and belief, when he was Warden, he was the highest policymaking official of SAN QUENTIN, responsible for the oversight, management, hiring, decisions, policies, procedures, provision of services, and supervision of all employees and agents of SAN QUENTIN.  He was also ultimately responsible at San Quentin for the safety and health of all inmates and staff at SAN QUENTIN, and preventing and handling contagious disease outbreaks at SAN QUENTIN.  On information and belief, he was personally involved in the decision(s) to send CIM inmates to San Quentin in May, 2020, the manner in which that inmate transfer was done, the manner and location of housing assignments for inmates at San Quentin, and the manner in which officials caused, addressed, or failed to address the COVID-19 outbreak at SAN QUENTIN.  At all material times, he was employed by the State of California, and acted within the course and scope of that employment.

13.     At material times, Defendant RONALD BROOMFIELD was the Acting Warden of SAN QUENTIN.  On information and belief, when he was Acting Warden, he was the highest policymaking official of SAN QUENTIN, responsible for the oversight, management, hiring, decisions, policies, procedures, provision of services, and supervision of all employees and agents of SAN QUENTIN.  As Acting Warden, he was also ultimately responsible at San Quentin for the safety and health of all inmates and staff at SAN QUENTIN, and preventing and handling contagious disease outbreaks at SAN QUENTIN.   On information and belief, he was personally involved in the decision(s) to send CIM inmates to San Quentin in May, 2020, the manner in which that inmate transfer was done, the manner and location of housing assignments for inmates at San Quentin, and the manner in which officials caused, addressed, or failed to address the COVID-19 outbreak at SAN QUENTIN.  At all material times, he was employed by the State of California, and acted within the course and scope of that employment.

14.     At all material times, CLARENCE CRYER was the Chief Executive Officer for Health Care ("CEO") of SAN QUENTIN.  On information and belief, he was a policy-making official concerning medical care and health at SAN QUENTIN, and served as a principal advisor in institution-specific application of health care policies and procedures.  On information and belief, he was also responsible for: planning, organizing, and coordinating the implementation of the health care delivery system at SAN QUENTIN; supervising health care program managers responsible for administrative services within health care; ensuring adequate resources are requested to support health care operation; and preventing and handling contagious disease outbreaks at SAN QUENTIN.  On information and belief, he was personally involved in the decision(s) to send CIM inmates to San Quentin in May, 2020, the manner in which that inmate transfer was done, the manner and location of housing assignments for inmates at San Quentin, and the manner in which officials caused, addressed, or failed to address the COVID-19 outbreak at SAN QUENTIN.  At all material times, he was employed by the State of California, and acted within the course and scope of that employment.

15.     At all material times, ALISON PACHYNSKI, M.D., was a licensed physician Board certified in internal medicine, and the Chief Medical Executive of SAN QUENTIN.  On information and belief, she was a policy-making official concerning medical care and health at SAN QUENTIN, and was responsible for medical-related oversight, management, policies, procedures, provision of services,

supervision of all medical employees and agents, and preventing and handling contagious disease outbreaks at SAN QUENTIN.  On information and belief, she was personally involved in the decision(s) to send CIM inmates to San Quentin in May, 2020, the manner in which that inmate transfer was done, the manner and location of housing assignments for inmates at San Quentin, and the manner in which officials caused, addressed, or failed to address the COVID-19 outbreak at SAN QUENTIN.  At all material times, she was employed by the State of California, and acted within the course and scope of that employment.

16.     At all material times, SHANNON GARRIGAN, M.D., was Chief Physician and Surgeon of SAN QUENTIN.  On information and belief, she was a policy-making official and was responsible for medical-related oversight, management, policies, procedures, provision of services, supervision of all medical employees and agents, and preventing and handling contagious disease outbreaks at SAN QUENTIN.  On information and belief, she was personally involved in the decision(s) to send CIM inmates to San Quentin in May, 2020, the manner in which that inmate transfer was done, the manner and location of housing assignments for inmates at San Quentin, and the manner in which officials caused, addressed, or failed to address the COVID-19 outbreak at SAN QUENTIN.  At all material times, she was employed by the State of California, and acted within the course and scope of that employment.

17.     At all material times, LOUIE ESCOBELL, R.N. was the Chief Executive Officer for Health Care ("CEO") of the California Institute for Men (CIM).  On information and belief, he was a policy-making official concerning medical care and health at CIM, and served as a principal advisor in institution-specific application of health care policies and procedures.  On information and belief, he was also responsible for: planning, organizing, and coordinating the implementation of the health care delivery system at CIM; supervising health care program managers responsible for administrative services within health care; and ensuring adequate resources are requested to support health care operation, and preventing and handling contagious disease outbreaks at CIM.  On information and belief, he was personally involved in the decision(s) to send CIM inmates to San Quentin in May, 2020, and the manner in which that inmate transfer was done.  At all material times, he was employed by the State of California, and acted within the course and scope of that employment.

18.     At all material times, MUHAMMAD FAROOQ, M.D., was Chief Medical Executive of CIM.  On information and belief, he was a policy-making official concerning medical care and health at CIM, and was responsible for medical-related oversight, management, policies, procedures, provision of services, supervision of all medical employees and agents, and preventing and handling contagious disease outbreaks at CIM.  On information and belief, he was personally involved in the decision(s) to send CIM inmates to San Quentin in May, 2020, and the manner in which that inmate transfer was done.  At all material times, he was employed by the State of California, and acted within the course and scope of that employment.

19.     At all material times, KIRK TORRES, M.D., was Chief Physician and Surgeon of CIM.  On information and belief, he was a policy-making official and was responsible for medical-related oversight, management, policies, procedures, provision of services, supervision of all medical employees and agents, and preventing and handling contagious disease outbreaks at CIM.  On information and belief, he was personally involved in the decision(s) to send CIM inmates to San Quentin in May, 2020, and the manner in which that inmate transfer was done.  At all material times, he was employed by the State of California, and acted within the course and scope of that employment.

20.     The true names or capacities, whether individual, corporate, associate, or otherwise, of Defendants named herein as DOES 1 through 20 are unknown to Plaintiffs, who therefore sue said Defendants by said fictitious names.  Plaintiffs will amend this Complaint to show said Defendants' true names and capacities at an appropriate time when the same have been ascertained.  Plaintiffs are informed, believe, and thereon allege that all Defendants sued herein as DOES are in some manner responsible for the acts, omissions, and injuries alleged herein.  Plaintiffs allege, on information and belief, that each of the Defendants sued herein was wrongfully, deliberately indifferently, negligently, and/or otherwise responsible in some manner for the events and happenings as hereinafter described, and proximately caused injuries and damages to Plaintiffs and/or Decedent.  Further, one or more DOE Defendants was at all material times responsible for the hiring, training, supervision, and discipline of other defendants, including both the individually named and DOE Defendants.

21.     MONICA RUIZ is named herein as a nominal Defendant, because she is not represented by Plaintiffs' counsel, and on information and belief, she is a daughter of Decedent DANIEL RUIZ, may

be entitled to bring a claim related to the death of DANIEL RUIZ, and under California law, may be considered a "necessary party" for Plaintiffs' wrongful death claims.  (See *G.M. v. Poole*, CAED No. 2:17-cv-02415-TLN-CKD, 2019 U.S. Dist. LEXIS 156259 *; 2019 WL 4318573 (E.D. Cal. September 12, 2019); *Backer v. United States*, CASE NO. 1:13-CV-1552 AWI-GSA (E.D. Cal. August 29, 2014)).  On information and belief, Ms. RUIZ did not present a tort claim to the STATE OF CALIFORNIA pursuant to Government Code § 910 et seq.  Ms. RUIZ, therefore, is named as a nominal Defendant consistent with the stipulation of Plaintiffs and remaining Defendants (Doc. 20), and with Order of this Court (Doc. 22).  MONICA RUIZ is over the age of eighteen.  On information and belief, she is a resident of the State of California.  Plaintiffs do not believe or claim that MONICA RUIZ is in any way responsible for DANIEL RUIZ's death.

22.     All individual Defendants are sued in their individual capacities.

23.     Plaintiffs are informed, believe, and thereon allege that each of the Defendants was at all material times an agent, servant, employee, partner, joint venturer, co-conspirator, and/or alter ego of the remaining Defendants, and in doing the things hereinafter alleged, was acting within the course and scope of that relationship.  Plaintiffs are further informed, believe, and thereon allege that each of the Defendants herein gave consent, aid, and assistance to each of the remaining Defendants, and ratified and/or authorized the acts or omissions of each Defendant as alleged herein, except as may hereinafter be otherwise, specifically alleged.  At all material times, each Defendant was an integral participant, jointly and fundamentally engaged in constitutionally violative, unlawful, and/or tortious activity, resulting in the deprivation of Plaintiffs' and Decedent's constitutional rights and other actionable harm.

24.     At all material times, each Defendant acted under color of the laws, statutes, ordinances, and regulations of the State of California.

25.     A proper and timely tort claim was presented to the STATE OF CALIFORNIA on behalf of Plaintiffs and Decedent, pursuant to Government Code § 910 et seq., and this action was thereafter timely filed within all applicable statutes of limitation.

26.     This complaint may be pled in the alternative, pursuant to Rule 8(d)(2) of the Federal Rules of Civil Procedure.

**GENERAL ALLEGATIONS**

27.     In the midst of a global pandemic caused by a deadly virus, corrections officials transferred an infected inmate from a Southern California lockup to San Quentin prison, touching off an outbreak that swept through the institution, infecting and killing people inside. That transfer happened on April 18, 1918.  The global pandemic of H1N1 in 1918 caught San Quentin unprepared at the time, but the outbreak was well documented for future study.  Unlike in 1918, the outbreak of COVID-19 at San Quentin State Prison was predictable and, indeed, predicted.[1]

28.     DANIEL RUIZ was 61 years old at the time of his death from the COVID-19 Coronavirus on July 11, 2020.  In September 2019, he was arrested for a non-violent drug offense and for being a felon in possession of a firearm, and was incarcerated in the Sacramento County Jail.  On or about January 20, 2020, upon conviction he was transferred into SAN QUENTIN.  In March 2020, DANIEL RUIZ received an early release notice for good behavior and because he was incarcerated for non-violent crimes.  On information and belief, DANIEL RUIZ was approved for home release in April 2020.  He was a model inmate who got along well with corrections officers and other inmates.

29.     At all relevant times, it was each Defendant's duty to provide for the health, safety, and serious medical needs of persons in CDCR custody, including DANIEL RUIZ, as such persons had been deprived by the State of any means to protect themselves or care for their own medical needs.

30.     On March 4, 2020, California Governor Gavin Newsom proclaimed a State of Emergency in California as a result of the impacts of the COVID-19 pandemic.  On information and belief, by that time, all Defendants had been briefed and warned about the grave danger to health and life posed by the COVID-19 outbreak, including the highly transmissible nature of the virus and the necessity for precautions to prevent its spread, including but not limited to: quarantine of those known or suspected to have been exposed to the virus, the need for cleanliness, social distancing, and personal protective equipment, and the need to regularly test for virus carriers, as many can be asymptomatic.  Defendants also knew that it was virtually impossible to provide necessary social distancing inside San Quentin under then current conditions, due to tight quarters, overcrowding of inmates, shared spaces for eating and showering, antiquated facilities with many cells having open bars instead of solid doors and walls, and

---

[1] This paragraph was excerpted from the Office of the State Public Defender's (OSPD) Amicus Letter dated August 19, 2020, to the Honorable Geoffrey M. Howard, Marin County Superior Court, in the *San Quentin Consolidated Writ Proceeding*.

poor ventilation throughout San Quentin facilities.  Defendants also knew that the San Quentin population had a high proportion of older inmates compared to other correctional facilities, and due to the demographic makeup of the prison population in income, race, and education, there was a high rate of underlying chronic diseases that placed inmates at higher risk for morbidity and mortality if infected with COVID-19.  Further, Defendants knew that there was no on-site hospital for critically ill inmates.

31.     On March 16, 2020, the Health Officers of seven Bay Area Counties, including Marin County where SAN QUENTIN is located, issued shelter-in-place orders, enforceable as a misdemeanor, ordering all non-essential workers to shelter at home due to the COVID-19 pandemic.  Marin County's Order stated:  "All individuals currently living within Marin County ("County") are ordered to shelter at their place of residence.  To the extent individuals are using shared or outdoor spaces, they must at all times as reasonably possible maintain social distancing of at least six feet from any other person[]." (3/16/20 Order, ¶ 2).  The Order continued, "Due to the outbreak of the COVID-19 virus in the general public, which is now a pandemic according to the World Health Organization, there is a public health emergency throughout the County.  …The scientific evidence shows that at this stage of the emergency, it is essential to slow virus transmission as much as possible to protect the most vulnerable and to prevent the health care system from being overwhelmed.  One proven way to slow the transmission is to limit interactions among people to the greatest extent possible."  (3/16/20 Order, ¶ 6).  The Order required that "All Essential Government Functions shall be performed in compliance with Social Distancing Requirements" and defined those requirements as "maintaining at least six-foot social distancing from other individuals, washing hands with soap and water for at least twenty seconds as frequently as possible or using hand sanitizer, covering coughs or sneezes…, regularly cleaning high-touch surfaces, and not shaking hands." (3/16/20 Order, ¶¶ 10(d) and (j)).  The Order stated, "The violation of any provision of this Order constitutes an imminent threat to public health."  (3/16/20 Order, ¶ 11).

32.     On March 18, 2020, the Interim Executive Director of the Habeas Corpus Resource Center (HCRC), the State Public Defender, Mary McComb, and others responsible for representing people on death row, sent a letter to Defendants San Quentin Acting Warden RON BROOMFIELD and Chief Medical Executive ALISON PACHYNSKI.  The letter implored San Quentin to provide inmates with personal protective equipment (PPE) and cleaning supplies, to avoid quarantining COVID-19 patients in

punitive solitary confinement cells, to allow for social distancing, and other recommendations to protect the health of inmates and staff at the prison.  At that time, there were no COVID-19-positive inmates at San Quentin.

33.     On March 19, 2020, Governor Newsom announced a statewide shelter-in-place order, also enforceable as a misdemeanor.  In that order, the Governor wrote: "[F]or the preservation of public health and safety throughout the entire State of California, I find it necessary for all Californians to heed the State public health directives from the Department of Public Health."

34.     On March 24, 2020, in response to the COVID-19 outbreak, Governor Newsom issued Executive Order N-36-20, suspending intake of inmates into all state facilities for 30 days.  On information and belief, that order was extended beyond that initial 30 days.  Reportedly, until late May, 2020, California Correctional Health Care Services (CCHCS) had opposed transfers of inmates between prisons, saying that "mass movement of high-risk inmates between institutions without outbreaks is ill-advised and potentially dangerous" and noting that it "carries significant risk of spreading transmission of the disease between institutions."

35.     On April 17, 2020, six Bay Area counties – San Francisco, Alameda, Contra Costa, Marin, Sonoma and San Mateo Counties – issued a mask mandate, requiring all people not from the same household to wear a face mask when in the presence of other people, punishable as a misdemeanor.  By that time or within days, several other counties across the state had taken similar mandatory measures. Not just public health experts, but anyone in California vaguely paying attention to COVID-19 news and public health advice and mandates knew that COVID-19 was highly contagious, potentially deadly, and knew the basic rules to prevent COVID-19 outbreaks: avoid being in the presence of people from outside one's own household, especially inside buildings, vehicles, and other enclosed spaces; avoid public transportation; if you leave your home, wear a mask; sanitize and wash your hands constantly; sanitize surfaces, doorknobs, etc. around you with virus-killing agents when possible; report any Coronavirus symptoms you may have before entering any business or public establishment; quarantine if you develop Coronavirus symptoms or have possibly been exposed to someone with the virus; get tested for the Coronavirus frequently if possible, as many infected people can be asymptomatic.  These obvious and

1    simple public health measures were widely known by the general public in California; on information and

2    belief, all Defendants knew this information too.

3        36.    On May 30, 2020, Defendants STATE OF CALIFORNIA, CDCR, and all Defendants

4    herein ordered and approved the transfer of 122 people to SAN QUENTIN from the California Institution

5    for Men in Chino, California.  At that time, SAN QUENTIN still had no cases of COVID-19.  By

6    contrast, the Chino facility was struggling with a severe outbreak of COVID-19, which by then had

7    reportedly infected over 600 inmates and killed 9 of them.  Reportedly, all of the men who were

8    transferred had high medical risk factors.  And, most or all of the men who were transferred had not been

9    tested for COVID-19 for at least approximately three or four weeks.  The transferred inmates also were

10   not properly screened for current symptoms immediately before being placed on a bus.  Those transferred

11   inmates were packed onto buses in numbers far exceeding COVID-capacity limits that CDCR had

12   mandated for inmate safety, where some fell ill even before they arrived at SAN QUENTIN.  The

13   transferred inmates were tested for COVID-19 *after* they arrived at SAN QUENTIN – several tested

14   positive or already had symptoms.

15       37.    At SAN QUENTIN, Defendants ordered and approved the placement of the Chino inmates

16   in the Badger housing unit, where tiers of open-air cells open into a shared atrium.  On information, the

17   Defendants who ordered and approved such placement and handling of COVID-19 exposed inmates

18   include, but are not limited to: CDCR Secretary RALPH DIAZ, CDCR Medical Director R. STEVEN

19   THARRATT, M.D. (since deceased, and succeeded in this action by ESTATE OF ROBERT S.

20   THARRATT), San Quentin Warden RONALD DAVIS, San Quentin Acting Warden RONALD

21   BROOMFIELD, San Quentin CEO CLARENCE CRYER, San Quentin Chief Medical Executive

22   ALISON PACHYNSKI, M.D., and San Quentin Chief Physician and Surgeon SHANNON GARRIGAN,

23   M.D..  The transferred inmates used the same showers and ate in the same mess hall as the other inmates.

24   Within days, 25 of those transferred inmates tested positive for COVID-19.  A COVID-19 outbreak at

25   SAN QUENTIN quickly spread throughout the complex.  Over three weeks, the prison went from having

26   no cases to 499 confirmed cases of COVID-19.

27       38.    On information and belief all individual Defendants – CDCR Secretary RALPH DIAZ,

28   CDCR Medical Director R. STEVEN THARRATT, M.D. (deceased, and succeeded in this action by

ESTATE OF ROBERT S. THARRATT), San Quentin Warden RONALD DAVIS, San Quentin Acting

Warden RONALD BROOMFIELD, San Quentin CEO CLARENCE CRYER, San Quentin Chief

Medical Executive ALISON PACHYNSKI, M.D., San Quentin Chief Physician and Surgeon SHANNON

GARRIGAN, M.D., CIM CEO LOUIE ESCOBELL, R.N., CIM Chief Medical Executive

MUHAMMAD FAROOQ, M.D., CIM Chief Physician and Surgeon KIRK TORRES, M.D., and Does 1-

20 – were informed and approved the transfer of high risk inmates from CIM to San Quentin under the

conditions and in the manner that the transfer actually was done.  Additionally, by that time, each of these

Defendants was informed and knew about the grave dangers COVID-19 posed in a California prison

environment to inmates and staff.  Each Defendant also was informed and knew about the current

COVID-19 prevention and mitigation protocols recommended and/or ordered by health authorities,

including the Centers for Disease Control, among others.

39.     Despite actual knowledge of grave risk to San Quentin inmates, staff, and their families,

all Defendants ordered and/or approved this inmate transfer without timely, adequate and proper testing of

the men being transferred, knowing that inmates were being densely packed onto buses far in excess of

the previously ordered capacity limits, knowing that the transfer would not be done safely and according

to current medical guidelines and protocols, knowing that the transfer would not be done in accordance

with public health and county mask mandates, and without requiring proper protocols, quarantine, PPE,

distancing, proper masks, and precautions once those transferred men were brought to San Quentin, and

none of those precautions were taken at San Quentin.

40.     On June 1, 2020, upon learning of this dangerous transfer of untested inmates to San

Quentin, Marin County Public Health (MCPH) Officer Matthew Willis, M.D., M.P.H., immediately

recommended in a conference call that day with Defendants, including Defendant BROOMFIELD, that

all transferred inmates be completely sequestered from the native SAN QUENTIN population.  Instead,

Defendants oversaw those transferred inmates being placed in a large shared unit with existing SAN

QUENTIN inmates.  Dr. Willis further recommended mandatory mask wearing for all exposed inmates

and staff and that staff movement be restricted between different housing units.  On information and

belief, all Defendants were timely informed of Dr. Willis' urgent recommendations.  Instead, all

Defendants chose not to implement those basic safety measures, chose to violate and flout Marin

County's Public Health Officer Order, and ordered and agreed that Dr. Willis be informed that local health officers like him lacked authority to mandate measures in state-run prisons.  On June 3, Dr. Willis recommended to Defendants that they establish an incident commander with expertise in outbreak management at SAN QUENTIN.  Defendants did not institute an Incident Command until a month later on July 3, and only after the Marin County Board of Supervisors appealed to Governor Newsom for that step.

41.     On or about June 13, 2020, a group of health experts toured San Quentin at the request of the federal court-appointed medical monitor, and CCHCS Director, J. Clark Kelso.  All Defendants were informed that those experts wrote an "Urgent Memo" dated June 15, 2020, warning that the COVID-19 outbreak at San Quentin could develop into a "full-blown local epidemic and health care crisis in the prison and surrounding communities."  The public health experts also warned that overcrowding together with physical risk factors at San Quentin created high risk for a "catastrophic super-spreader event." There was also a grave lack of personal protective equipment and masks at San Quentin, to the point where inmates had to make inadequate masks out of cloth, and Defendants even refused to provide adequate masks and personal protective equipment (PPE) to their own staff.  Prison staff and inmates were commonly not wearing masks, or were wearing them improperly.  All of this was already known and tolerated by all Defendants.  The public health experts warned that virus testing delays at San Quentin were far too long, pointing out that "5-6 days or more is completely unacceptable."

42.     Those public health experts further warned:

Especially given that early identification of suspected COVID-19 cases depends on reporting of symptoms, quarantine strategies relying on the Adjustment Center or cells usually used for punishment may thwart efforts for outbreak containment as people may be reluctant to report their symptoms. In addition, people with COVID-19 are known to experience rapid physical decompensation; it may therefore be particularly detrimental for a patient with COVID-19 to be behind a solid door in the most secure areas of the prison out of the sight of medical or nursing staff in the case of an emergency. This may be particularly risky if there are structural barriers to communicating distress to staff (e.g., if accommodations are not readily accessible for people with disabilities or who speak other languages, and/or there are multiple security stages to pass through).

(Emphasis in original).

43.     Those public health experts further wrote in their report: "It is important to note that we spoke to a number of incarcerated people who were over the age of 60 and had a matter of weeks left on

their sentences.  <u>It is inconceivable that they are still in this dangerous environment.</u>"  (Emphasis in original).  Those health experts recommended specific measures needing immediate implementation, including but not limited to large-scale release or transfer of inmates, of which all Defendants were informed and chose to disregard.  Rather than release significant numbers of at-risk inmates, all Defendants ordered and approved that sick inmates would be moved to punitive housing assignments at San Quentin, including solitary confinement, further exacerbating problems as many sick inmates, on information and belief, did not want to report their symptoms and hundreds of inmates refused testing for fear of such punitive incarceration.

44.     In March and again in June, 2020, Innovative Genomics Institute at Berkeley, California, offered to provide free COVID-19 testing for SAN QUENTIN, of which all Defendants were aware. Both times, Defendants rejected the offer.  A research laboratory with UCSF Medical Center also offered to provide COVID-19 testing and assistance to SAN QUENTIN in May and June.  All Defendants were informed and rejected those offers as well.  Medical monitor Kelso later testified that SAN QUENTIN and CDCR lacked testing resources in March and April, and by July, still was unable to provide timely testing results.  Meanwhile, Prison staff were begging for proper personal protective equipment and were told that to the extent San Quentin had such PPE, it was reserved for medical professionals and not front-line correctional officers and supervisors.  Correctional officers were relegated to wearing inmate-made masks sewn from inmate pants and other clothes, or masks created at home by their loved ones.  Prison staff also were not being regularly tested for COVID-19.  Prison staff were not trained about safety protocols for COVID-19, and were not required to follow safety protocols.  In addition, Defendants took no steps to protect their own medically vulnerable staff members from exposure to COVID-19.  All Defendants were aware of and tacitly or actively approved these obviously dangerous conditions and practices at SAN QUENTIN.

45.     At a California Senate Committee on Public Safety meeting on July 1, 2020, state senators called the March 30 transfer of inmates to San Quentin a "horribly botched transfer," a "failure of leadership," "completely avoidable," "abhorrent," and a "fiasco."  A California Assembly member labeled the transfer the "worst prison health screw up in state history."  Medical monitor Clark Kelso testified,

"what we've done to date still is not enough."  Dr. Mark Ghaly, who heads California's Health and Human Services Agency, reportedly said, "There is no dispute that more could be and should be done."

46.     On July 6, 2020, Defendant CDCR Medical Director R. STEVEN THARRATT, M.D. (since deceased, and succeeded in this action by ESTATE OF ROBERT S. THARRATT), was removed from his position by Medical Monitor Kelso.  Governor Newsom criticized Defendants' decision to transfer Chino inmates to San Quentin on May 30, saying, "They should not have been transferred."

47.     By July 7, 2020, reportedly more than 1,300 inmates and 184 staff had tested positive for COVID-19 at San Quentin.  By July 30, 2020, reportedly more than 2,181 San Quentin inmates had been infected – approximately two-thirds of the prison population there.  As of September 2, 2020, approximately 26 inmates and one Correctional Sergeant from San Quentin had died due to this COVID-19 outbreak.  Those deaths were preventable.  A study by the National Commission on COVID-19 and Criminal Justice found that the overall death rate from COVID-19 was more than twice as high in California prisons as compared to the general California population, taking into account differences in age, sex, race and ethnicity that make the prison population more vulnerable.  In contrast to California, 14 states had no COVID-19 deaths in their prisons, and six states had lower death rates for inmates than for their overall populations.

48.     Defendant RALPH DIAZ, Secretary of CDCR, announced his retirement on August 28, 2020.  Assemblymember Marc Levine, D-San Rafael, whose district includes San Quentin, concluded that day, "The spread of COVID-19 at state prisons was a preventable public health disaster and a failure of CDCR leadership at the highest level."

49.     On October 20, 2020, the California Court of Appeal, First Appellate District, Division Two, issued an opinion in *In re Von Staich*, 56 Cal.App.5th 53 (2020), review granted, request for depublication denied, remanded, __ Cal.4th __, 272 Cal.Rptr.3d 813 (Dec. 23, 2020), finding the following in connection with the COVID-19 outbreak at San Quentin and against several Defendants herein:

        a.     The San Quentin Warden and CDCR "have acted with deliberate indifference" to the rights and safety of San Quentin prisoners (*Id*., at 58);

b.  "By all accounts, the COVID-19 outbreak at San Quentin has been the worst epidemiological disaster in California correctional history" (*Id*., at 60);

c.  "The catalyst of the outbreak of COVID-19 infections and deaths was the transfer by CDCR of 121 inmates from the California Institution for Men (CIM) to San Quentin" (*Id*.);

d.  "[E]minent public health experts endorsed the conclusion of the Urgent Memo that inmates of San Quentin could be protected against the risks presented by COVID-19 only if the population of San Quentin was drastically reduced with dispatch" (*Id*., at 63);

e.  "The declaration filed by Dr. Chris Beyrer, professor of epidemiology, international health, and medicine at the Johns Hopkins Bloomberg School of Public Health, states it is 'self-evident from the 75% infection rate and rates of morbidity and mortality at San Quentin, that its response to the outbreak there has been a failure to protect the lives of inmates and staff.  Had San Quentin done nothing, the rates of infection there would have been roughly the same.  It is a disaster that could have been avoided by releasing substantial numbers of people as UCSF experts repeatedly recommended.'" (*Id*.);

f.  "CDCR did not implement the 50 percent reduction deemed essential by the Urgent Memo solicited in its behalf by the federal receiver" (*Id*., at 64);

g.  "The Eighth Amendment to the United States Constitution and article I, section 17 of the California Constitution both require correctional officials to provide inmates adequate medical care" (*Id*., at 68-69);

h.  "It is doubtful any correctional agency in the United States is as familiar with the adverse consequences of mass incarceration on inmates' medical care, and the need to prevent them, as CDCR is or should be, given its litigation of the issue in the Plata and Coleman cases since the turn of the century.  Respondents [CDCR, San Quentin Warden, and other Defendants herein] concede the point and agree that responsible prison officials were 'subjectively aware' of the risk COVID-19 presents to 'inmate health or safety.'" (*Id*., at 69);

i. "[R]espondents concede 'actual knowledge' of the 'substantial risk of serious harm' to San Quentin inmates and accept their duty to alleviate their 'serious medical needs.'" (*Id.*, at 78);

j. "[T]he efforts Respondents have taken to control COVID–19 in San Quentin are insufficient to protect inmates from COVID–19 without the speedy reduction of the population of that prison by at least half" … "[R]espondents' failure to accompany the measures they are taking with a drastic reduction of the prison population is not reasonable" (Id., at 78-79);

k. "At a prison with 'exceedingly poor ventilation, extraordinarily close living quarters, and inadequate sanitation' due to its uniquely antiquated infrastructure, in which 75 percent of the population has been infected with COVID-19, and 28 infected inmates have recently died, the continued use of double cells and congregate living spaces is not merely negligent, it is reckless.  The recklessness is aggravated by Respondents' refusal to consider the expedited release, or transfer, of prisoners who are serving time for violent offenses but have aged out of a propensity for violence (life prisoners eligible for parole and older second and third strikers)—a large and still growing class of San Quentin prisoners who are more vulnerable to COVID-19 and less likely to recidivate than the prisoners whose expedited release CDCR facilitates." (Id. at 79);

l. "[R]espondents have shown deliberate indifference to the risk of substantial harm to petitioner, a life prisoner whose age makes him vulnerable to COVID-19" (Id., at 80);

m. "We agree that CDCR's deliberate indifference to the risk of substantial harm to petitioner necessarily extends to other similarly situated San Quentin inmates" (Id., at 81).

n. "'Prisoners retain the essence of human dignity inherent in all persons.  Respect for that dignity animates the Eighth Amendment prohibition against cruel and unusual punishment.  The basic concept underlying the Eighth Amendment is nothing less than the dignity of man.'  'A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society.'" (citations omitted) (Id. at 80);

50.     On August 17, 2020, the Office of the Inspector General ("OIG") issued the first of a three-report series responding to Speaker of the California Assembly Anthony Rendon's formal request to assess CDCR's policies, guidance, and directives regarding COVID-19.  In the report, titled *COVID-19 Review Series, Part One: Inconsistent Screening Practices May Have Increased the Risk of COVID-19 Within California's Prison System*, the OIG concluded that "[CDCR's] vague screening directives resulted in inconsistent implementation among the prisons, which left some staff and visitors entering prisons unscreened."  More specifically, the report emphasized the following concerns: employees moving freely in and out of the screening location, potentially interacting with individuals yet to be screened; failure to screen all employees coming in; faulty thermometers at screening stations; and lack of training for screeners.  Notably, roughly seven percent of surveyed employees at SAN QUENTIN reported that they had not always been screened before entering the prison—the highest rate among the seven institutions analyzed.  OIG staff were not screened in three of their four visits to SAN QUENTIN, and entered the Warden's office unscreened on four occasions because it was located outside of the screening area.  Forty-seven percent of screeners at SAN QUENTIN reported that they received no screening training at all.  All screeners at SAN QUENTIN reported that they received no thermometer training, and one SAN QUENTIN screener reported thermometer readings as low as 80 degrees Fahrenheit.

51.     On October 26, 2020, the OIG issued its second report, entitled *COVID-19 Review Series, Part Two: The California Department of Corrections and Rehabilitation Distributed and Mandated the Use of Personal Protective Equipment and Cloth Face Coverings; However, Its Lax Enforcement Led to Inadequate Adherence to Basic Safety Protocols*.  The OIG concluded that lax enforcement by CDCR supervisors and managers [which include Defendants herein] likely contributed to noncompliance among staff members and inmates with protocols related to face coverings and social distancing.  The OIG reported that thirty-one percent of employees surveyed at seven different prisons reported seeing employees or inmates improperly wearing face coverings, and thirty-eight percent reported seeing employees or inmates not complying with physical distancing requirements.  SAN QUENTIN's surveyed employees reported such offenses at rates of thirty-eight and forty-five percent, respectively.  These offenses were not limited to inmates and rank-and-file staff; the OIG report noted several instances of

noncompliance (and failure to address noncompliance) observed first-hand by OIG investigators across all levels of prison personnel.  Despite these indications and first-hand observations of widespread noncompliance, a survey of records from five prisons *combined* revealed only 29 disciplinary actions against noncompliant employees, only one of which was punitive.  Notably, SAN QUENTIN took only *one* disciplinary action, which the report characterized as "especially alarming" given that more than 2,100 inmates and more than 270 staff members at SAN QUENTIN had tested positive for COVID-19 by September 2020. The OIG concluded that lax compliance and enforcement of mask-wearing was partially due to the CDCR's characterization of the policy as an "expectation" (rather than a "mandate") and its failure to definitively direct supervisors and managers to issue corrective action for noncompliance.

52.     On February 1, 2021, the California Office of the Inspector General released its third report in the "COVID-19 Review Series," entitled: *California Correctional Health Care Services and the California Department of Corrections and Rehabilitation Caused a Public Health Disaster at San Quentin State Prison When They Transferred Medically Vulnerable Incarcerated Persons from the California Institution for Men Without Taking Proper Safeguards*.  ("Third OIG Report").  In an accompanying letter to Speaker of the California Assembly, Anthony Rendon, the Inspector General wrote:

> Our review found that the efforts by CCHCS and the department to prepare for and execute the transfers were deeply flawed and risked the health and lives of thousands of incarcerated persons and staff.  Insistence by CCHCS and the department to execute the transfers and subsequent pressure to meet a tight deadline resulted in the California Institution for Men ignoring concerns from health care staff and transferring the medically vulnerable incarcerated persons, even though the vast majority had not been recently tested for COVID-19.  With outdated test results, the prison had no way to know whether any of the incarcerated persons were currently infected with the virus.  According to email conversations that we reviewed, a California Institution for Men health care executive explicitly ordered that the incarcerated persons not be retested the day before the transfers began, and multiple CCHCS and departmental executives were aware of the outdated nature of the tests before the transfers occurred.
>
> In addition to the department transferring the medically vulnerable incarcerated persons despite outdated tests, prison health care staff conducted verbal and temperature screenings on multiple transferring incarcerated persons too early to determine whether they had symptoms of COVID-19 when they boarded the buses.  As a result, some of the incarcerated persons may have been experiencing symptoms consistent with COVID-19 when they left the prison.  The risk of placing some symptomatic incarcerated persons on the buses was exacerbated by another inexplicable decision approved by CCHCS executives to increase the number of incarcerated persons on some of the buses, thus

1   decreasing the physical distance between them, and increasing the risk that the virus
    could spread among the incarcerated persons and staff on the buses.

2           Once the incarcerated persons arrived at San Quentin, nursing staff immediately
3   noted that two of the incarcerated persons arrived with symptoms consistent with
    COVID-19.  Nonetheless, the prison housed almost all of the incarcerated persons who
4   arrived from the California Institution for Men in a housing unit without solid doors,
5   allowing air to flow in and out of the cells.  By the time the prison tested the incarcerated
    persons for COVID-19, many of those who tested positive had been housed in the unit for
6   at least six days.  The virus then spread quickly through the housing unit and to multiple
7   areas throughout the prison.  The prison's inability to properly quarantine and isolate
    incarcerated persons exposed to or infected with COVID-19, along with its practice of
8   allowing staff to work throughout the prison during shifts or on different days, likely
9   caused the virus to spread to multiple areas of the prison.  According to data the
    department provided to support its COVID-19 population tracker, by the end of August
10  2020, 2,237 incarcerated persons and 277 staff members became infected with the virus.
11  In addition, 28 incarcerated persons and one staff member died as a result of
    complications from COVID-19.  In contrast, Corcoran, likely because it is a much newer
12  prison consisting mostly of cells with solid doors, experienced a much smaller outbreak.
    An animated graphic displaying the progression of the COVID-19 outbreaks coursing
13  through the various housing units at San Quentin and Corcoran after the transfers had
    been effected can be viewed on our website at www.oig.ca.gov.

14          Our review also found that when staff became aware of the positive test results
15  shortly after the incarcerated persons arrived, both prisons failed to properly conduct
    contact tracing investigations.  According to San Quentin, there were too many positive
16  cases over a short period of time to conduct contact tracing.  In addition, Corcoran staff
17  failed to identify any contacts other than those living in cells adjacent to those of the
    incarcerated persons who tested positive. By failing to thoroughly conduct contact
18  tracing, the prisons may have failed to alert some close contacts of the infected
    individuals, increasing the risk of further spread of the virus.

19          Since the transfers, CCHCS and the department have taken multiple actions to
20  better safeguard incarcerated persons transferring between prisons, including
    implementing procedures requiring prisons to conduct COVID-19 testing of transferring
21  incarcerated persons no more than five days before the transfer, followed by a rapid test
    on the day of the scheduled transfer.  We did not review the adequacy of the additional
22  steps taken by CCHCS and the department, but if consistently carried out, they should
23  help prevent future disasters such as the one detailed in this report.  Nonetheless, on
    December 31, 2020, the department reported 8,507 active cases of COVID-19 among its
24  incarcerated population and 4,333 active cases among its staff.  In addition, tragically, the
    department reported COVID-19-related deaths of 130 incarcerated persons and 11 staff
25  members.  Therefore, CCHCS' and the department's arduous task of containing the virus
    within its prisons remains unfinished.

    53.     The Third OIG report summary further explains that nurses at CIM questioned packing

26  untested inmates on buses to San Quentin, including by email asking: "What about Patient [sic] safety?

27  What about COVID precautions?"  The report concludes, "The decision to transfer the medically

28

vulnerable incarcerated persons despite such outdated test results was not simply an oversight, but a conscious decision made by prison and CCHCS executives."  (OIG Report, p. 2).  On information and belief, those "prison and CCHCS executives" include all Defendants herein.

54.     As a result of this public health debacle at San Quentin, on February 1, 2021, Cal-OSHA cited the CDCR and San Quentin with 14 violations, including five that were "serious" and four that were "willful-serious." The conduct generating these violations included, for example, failing to protect employees in numerous ways, including lack of training, lack of testing, lack of adequate and proper PPE, refusal to provide employees with legally required respirators at least as effective as N95 respirators, failing to provide adequate soap in an employee restroom, failing to have legally required policies and procedures to prevent the spread of airborne infections, choosing not to transfer infected inmates to outside facilities when Defendants did not have legally required isolation facilities on-site, refusing to de-contaminate vehicles used to transport COVID infected inmates to the hospital, not keeping track of COVID-infected employees or investigating exposure incidents, willfully transferring COVID-infected inmates between housing units, willfully refusing to isolate inmates transferred to San Quentin from the California Institute for Men in cells with solid doors, willfully refusing to isolate COVID-infected inmates, refusing to contact the local health officer, refusing to implement all public health measures recommended by the local health officer, failing to exclude COVID-positive employees from their work assignments, refusing to provide face shields and eye protection to all employees with direct exposure to infected inmates and coworkers, failing to ensure an adequate supply of latex and nitrile gloves for employees who worked with inmates, failing to require or provide physical distancing, permitting employees and inmates to go without face coverings, mixing COVID-infected inmates with other inmates in non-infected tiers, refusing to properly store N95 respirators in all transport vehicles, failing to provide medical evaluations for employees needing respirators, refusing to make COVID testing readily available, failing to train employees about COVID-19 and their occupational exposure risk, failing to properly isolate and quarantine possibly infected persons, and failing to conduct contact tracing, among others. Cal-OSHA noted that CDCR/San Quentin even "ran industrial fans in infected housing areas."

55.     Defendants and CDCR have rejected Plaintiffs' multiple and lawful requests for MR. RUIZ's custody records that should contain details and information concerning the specific handling of

DANIEL RUIZ, his infection with COVID-19, and their non-medical handling and treatment of him once he became ill.  And, as set forth below, Defendants refused to allow Plaintiffs any contact with DANIEL RUIZ until two weeks after he had been transferred to the hospital and had been on a ventilator for many days.

56.     On information and belief, Defendants and their delegees knew or must have known that DANIEL RUIZ had multiple high-risk factors for COVID-19, including but not limited to (1) age (he was 61 years old); (2) Obesity; (3) Asthma; (4) Chronic Obstructive Pulmonary Disease ("COPD"); (5) Lipidemia; and (6) Hepatitis C.  Further, Defendants knew or must have known that DANIEL RUIZ was in prison for non-violent, relatively minor offenses, was a model inmate, and was due to be released within a matter of weeks.

57.     By May 30, 2020, DANIEL RUIZ had not been released from San Quentin, despite the COVID-19 emergency, despite his high-risk factors, and despite his eligibility for early release.  Due to Defendants' wrongful decisions, acts, and deliberate omissions described herein, DANIEL RUIZ contracted COVID-19 while in Defendants' custody and care.  At this time, Defendants have still not allowed Plaintiffs to be informed of the exact circumstances under which DANIEL RUIZ became ill with COVID-19.  However, by June 18, 2020, Mr. Ruiz had symptoms of the virus and was tested for COVID-19.  His test came back positive for the virus on June 19, 2020.  On or about June 22, 2020, Defendants and their designees had Mr. Ruiz admitted to St. Francis Memorial Hospital, in San Francisco.  Within approximately one week, DANIEL RUIZ was placed on a ventilator.

58.     Cal. Pen. Code § 5022 required Defendant RALPH DIAZ and other Defendants to obtain and annually update contact information for people who "shall be notified" in the event of an inmate's death, serious illness, or serious injury.  Further, Cal. Prob. Code §§ 4701 et seq. and 4717 provide that an incarcerated patient may designate a surrogate for decision-making in the event the patient may become incapacitated.  Despite these statutory obligations, Defendants ALISON PACHYNSKI, M.D. and SHANNON GARRIGAN, M.D., with the knowledge and approval of other unknown Defendants, and without the knowledge or approval of DANIEL RUIZ or any of his Plaintiff-children, appointed themselves to be DANIEL RUIZ'S surrogates, to make medical decisions for DANIEL RUIZ. Defendants made significant medical decisions on behalf of DANIEL RUIZ, such as approving kidney

dialysis, without ever informing Plaintiffs or permitting Mr. Ruiz's family to be informed of his condition and Defendants' decisions.  Defendants PACHYNSKI and GARRIGAN informed the hospital that all medical decisions and family updates would go through them: "all medical decisions would go through state prison MD, including any updates to family."  Defendants, including Doctors PACHYNSKI, GARRIGAN and their subordinates, prohibited the hospital from informing DANIEL RUIZ's family that he was in the hospital, or that he was being treated for a severe and life-threatening COVID-19 infection.  Despite assigning themselves to be medical surrogates and to inform DANIEL RUIZ's family of his condition, Defendants PACHYNSKI and GARRIGAN did not inform Plaintiffs of Mr. Ruiz's serious illness with COVID-19, hospitalization, or placement on a ventilator.  No one informed Plaintiffs and DANIEL RUIZ's family that he was no longer at San Quentin and had been admitted to a hospital, or that he was in the Intensive Care Unit fighting for his life, until July 6, 2020, the day after Mr. Ruiz had coded and had to be resuscitated, but was unlikely to survive.  Only after Mr. Ruiz was unlikely to survive did Defendant SHANNON GARRIGAN permit San Quentin staff to contact Mr. Ruiz's family and inform them of his hospitalization, and permit the hospital to have contact with his family.

59.     Due to the policies promulgated and enforced by Defendants and their designees -- including but not limited to Defendants PACHYNSKI and GARRIGAN -- St. Francis Memorial Hospital Staff and other medical personnel treating DANIEL RUIZ for COVID-19-related illness were prohibited from informing his family, including Plaintiffs, that he was dying from COVID-19, or gravely ill, or even that he was there at the hospital.  Plaintiffs were not informed by Defendants or medical treaters that DANIEL RUIZ was tested or presumed positive for COVID-19 until he was in respiratory failure and Defendants believed he was unlikely to survive.  Defendants denied DANIEL RUIZ any contact with his family for many days, until shortly before he died.  The only in-person contact that Plaintiffs SANTOS RUIZ and FERNANDO VERA were able to have with DANIEL RUIZ before he died was to be in his hospital room briefly, wearing full protective suits, masks, and gear, without touching DANIEL RUIZ and without being fully able to communicate with him.  DANIEL RUIZ was still ventilated and could not speak.  Other Plaintiffs were denied any contact with DANIEL RUIZ besides a couple of brief "Zoom" videoconference meetings shortly before he died.  Thus, Defendants further interfered with and violated Plaintiffs' and DANIEL RUIZ's rights to familial association and companionship.  Such policies and

practices ordered and tolerated by Defendants were cruel, senseless, and in wanton disregard for DANIEL RUIZ's and Plaintiffs' rights, dignity, and humanity.

60.     On July 8, 2020, Plaintiffs and the rest of DANIEL RUIZ's family were told by hospital officials that they had to make the painful decision of when to remove DANIEL RUIZ from life support. All of his organs had collapsed, and despite his being conscious, there was no hope for his survival. DANIEL RUIZ was aware of his own impending death, away from his family.  By July 11, his death was imminent.  DANIEL RUIZ died alone, without his beloved family by his side.  DANIEL RUIZ was a loving son, father, and brother, deeply loved by his close-knit family, and his death has been devastating for them.

61.     Each Defendant's deliberate indifference to DANIEL RUIZ's safety and serious medical needs, along with the safety and serious medical needs of all SAN QUENTIN inmates and staff, and Defendants' other tortious, unconstitutional, and/or otherwise wrongful conduct caused DANIEL RUIZ's death.

62.     At all material times and, alternatively, the actions and omissions of each Defendant were intentional, and/or wanton and/or willful, and/or conscience-shocking, and/or reckless, and/or callous, and/or malicious, and/or deliberately indifferent to Plaintiff's and Decedent's rights, and/or grossly negligent, and/or negligent.

63.     As a direct and proximate result of each Defendant's acts and/or omissions as set forth above, each Plaintiff, individually, sustained the following injuries and damages, past and future, including, but not limited to:

   a.   Wrongful death of DANIEL RUIZ;

   b.   Loss of support and familial relationships, including loss of love, companionship, comfort, affection, society, services, solace, and moral support;

   c.   Emotional distress from the violations of their personal Constitutional rights, including grief, sorrow, anxiety worry, anger, humiliation, and indignity;

   d.   Loss of enjoyment of life;

   e.   All other legally cognizable special and general damages;

   f.   Violations of state and federal constitutional rights; and,

g. All damages, punitive damages, and penalties recoverable under 42 U.S.C. §§ 1983 and 1988, California Civil Code §§ 52 and 52.1, Cal. Code of Civil Procedure 1021.5, and as otherwise allowed under California and United States statutes, codes, and common law.

64.    As a direct and proximate result of each Defendant's acts and/or omissions as set forth above, Plaintiffs SANTOS RUIZ, FERNANDO VERA, VANESSA ROBINSON, and DANIEL RUIZ, JR., as Successors in Interest for Decedent DANIEL RUIZ, sustained the following injuries and damages, past and future, including, but not limited to:

a. Hospital and medical expenses incurred by DANIEL RUIZ;

b. Coroner's fees, funeral, and burial expenses;

c. DANIEL RUIZ's loss of life, pursuant to federal civil rights law;

d. DANIEL RUIZ's conscious pain and suffering, pursuant to federal civil rights law;

e. All damages, punitive damages, and penalties recoverable under 42 U.S.C. §§ 1983 and 1988, 42 U.S.C. § 12132 and 28 C.F.R. §35, et seq., 29 U.S.C. § 794, et seq., California Civil Code §§ 52 and 52.1, Cal. Code of Civil Procedure 1021.5, and as otherwise allowed under California and United States statutes, codes, and common law.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (42 U.S.C. § 1983)
### PLAINTIFFS AGAINST DEFENDANTS DIAZ, ESTATE OF THARRATT, DAVIS, BROOMFIELD, CRYER, PACHYNSKI, GARRIGAN, ESCOBELL, FAROOQ, TORRES, AND DOES 1-20

65.     Plaintiffs re-allege and incorporate by reference each and every allegation contained in this complaint, as though fully set forth here.

66.     By the actions and omissions described above, Defendants RALPH DIAZ, ESTATE OF ROBERT S. THARRATT, RONALD DAVIS, RONALD BROOMFIELD, CLARENCE CRYER, ALISON PACHYNSKI, M.D., SHANNON GARRIGAN, M.D., LOUIE ESCOBELL, R.N., MUHAMMAD FAROOQ, M.D., KIRK TORRES, M.D., and DOES 1-20, acting under the color of state law in their individual capacities, deprived DANIEL RUIZ of the rights, privileges, and immunities secured by the First, Eighth, and Fourteenth Amendments by subjecting him, or through their deliberate indifference, allowing others to subject him, to inhumane conditions of confinement and obviously unsafe conditions that created and increased DANIEL RUIZ's exposure to a serious communicable disease, causing him to contract COVID-19, then Defendants DIAZ, ESTATE OF THARRATT, DAVIS, BROOMFIELD, PACHYNSKI and GARRIGAN's interfering with DANIEL RUIZ's right to familial association while he battled for his life in the hospital, making medical decisions for him without ever communicating with his family or getting their input, failing or refusing to ascertain his designated emergency contacts and medical surrogates, and all Defendants ultimately causing his death.

67.     The listed Defendants knew that, due to aggravating factors including age, obesity, asthma, COPD, lipidemia, and Hepatitis C, DANIEL RUIZ faced significant risk of serious harm from exposure to COVID-19.  Defendants each further had actual knowledge of the grave danger to inmates, staff, and the community posed by a potential, and by the actual, COVID-19 outbreak at San Quentin, and of the reasonable, necessary, and feasible care and public health mandates to prevent such an outbreak. Defendants further had a duty to provide DANIEL RUIZ humane, safe, and sanitary living conditions, including a duty to act to abate exposure to serious communicable diseases, including COVID-19.

68.     The listed Defendants ignored, delayed, and/or denied to DANIEL RUIZ urgently needed measures and care necessary to maintain reasonably safe conditions for him at SAN QUENTIN, to avoid a disastrous COVID-19 outbreak and his exposure to it, and to address his safety and serious medical needs.  As a result of the Defendants' deliberate indifference to both DANIEL RUIZ's safety and medical needs, Plaintiffs suffered damages and deprivation of constitutional rights, as described herein.

69.     By the actions and omissions described above, the individually named Defendants violated 42 U.S.C. § 1983, depriving Plaintiffs and Decedent of the following well-settled constitutional rights that are protected by the First, Eighth, and Fourteenth Amendments to the U.S. Constitution:

   a.   The right to be free from deliberate indifference to DANIEL RUIZ's safety and medical needs while in state custody as an inmate, as secured by the Eighth Amendment; and

   b.   The right to be free from wrongful government interference with familial relationships and Plaintiffs' and Decedent's right to companionship, society, and support of each other, as secured by the First and Fourteenth Amendments.

70.     The listed Defendants are liable for their individual conduct and decisions, for their failures to intervene, prevent, or stop the constitutional violations by others when Defendants were in a position to so intervene when such violations were occurring, and for their supervisory failures that caused their subordinates to violate Plaintiffs' and Decedent's rights.

71.     Defendants subjected Plaintiffs to their wrongful conduct, depriving Plaintiffs and Decedent of the rights described herein, knowingly, maliciously, and with conscious and reckless disregard for whether the rights and safety of Plaintiffs (Individually and on behalf of DANIEL RUIZ) and others would be violated by their acts and/or omissions.

72.     As a proximate result of the foregoing wrongful acts and/or omissions, Plaintiffs sustained injuries and damages, as set forth above, in ¶¶ 63-64. Plaintiffs are, therefore, entitled to general and compensatory damages in an amount to be proven at trial.

73.     In committing the acts alleged above, the individually named Defendants and DOE Defendants acted maliciously, oppressively, and/or with reckless disregard for the rights and safety of Plaintiffs, Decedent, and others, and by reason thereof, Plaintiffs are entitled to punitive damages and penalties allowable under 42 U.S.C. § 1983, California Code of Civil Procedure §§ 377.20 et seq, and

other state and federal law against the individual Defendants.  Plaintiffs do not seek punitive damages against the STATE OF CALIFORNIA, CDCR, and SAN QUENTIN.

74.    Plaintiffs are also entitled to reasonable costs and attorney's fees under 42 U.S.C. § 1988 and other applicable California codes and laws.

## SECOND CAUSE OF ACTION
### (42 U.S.C. § 1983 – Supervisory Liability)
### PLAINTIFFS AGAINST DEFENDANTS DIAZ, ESTATE OF THARRATT, DAVIS, BROOMFIELD, CRYER, PACHYNSKI, GARRIGAN, ESCOBELL, FAROOQ, TORRES, AND DOES 1-20

75.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in this complaint, as though fully set forth herein.

76.    Plaintiffs allege, upon information and belief, the unconstitutional actions and/or omissions of the individually named Defendants and/or others acting on behalf of Defendants CDCR and SAN QUENTIN were pursuant to the following customs, policies, practices, procedures and official decisions of CDCR and/or SAN QUENTIN, stated in the alternative, which were made, directed, approved, encouraged, allowed, and/or ratified by policymaking officials for CDCR and/or SAN QUENTIN, including, but not limited to, Defendants CDCR Secretary RALPH DIAZ, ESTATE OF ROBERT S. THARRATT., San Quentin Warden RONALD DAVIS, San Quentin Acting Warden RONALD BROOMFIELD, San Quentin CEO CLARENCE CRYER, San Quentin Chief Medical Executive ALISON PACHYNSKI, M.D., San Quentin Chief Physician and Surgeon SHANNON GARRIGAN, M.D., CIM CEO LOUIE ESCOBELL, R.N., CIM Chief Medical Executive MUHAMMAD FAROOQ, M.D., CIM Chief Physician and Surgeon KIRK TORRES, M.D., and DOES 1-20:

      a. To require, approve, allow, and/or encourage the transfer of inmates to and/or within SAN QUENTIN without proper testing, screening, distancing, masking, PPE, isolation or quarantine, or taking other appropriate precautions to prevent and limit the introduction and spread of COVID-19 at SAN QUENTIN, with deliberate indifference to the rights and safety of inmates, staff, and others;

      b. To refuse and fail to properly and adequately classify, isolate or quarantine, test, and/or monitor inmates who were transferred to SAN QUENTIN, tested positive for COVID-19, were exposed or suspected of being exposed to COVID-19, or experienced symptoms consistent with COVID-19, with deliberate indifference to the rights and safety of inmates,

staff, and others;

c.   To deny inmates and staff at SAN QUENTIN access to appropriate PPE necessary to mitigate the risk of contracting COVID-19, with deliberate indifference to the rights and safety of inmates, staff, and others;

d.   To reject and fail to institute legally required policies and procedures to prevent the spread of airborne infections, including COVID-19, with deliberate indifference to the rights and safety of inmates, staff, and others;

e.   To refuse and fail to adequately screen SAN QUENTIN employees for COVID-19 symptoms or other factors indicating a risk of infection before entering SAN QUENTIN and other CDCR facilities, and to require staff to work multiple shifts, with overtime, in different areas and structures, without necessary PPE, with deliberate indifference to the rights and safety of inmates, staff, and others;

f.   To refuse and fail to acquire, and to reject repeated offers of, COVID-19 testing resources necessary to monitor and control the presence and spread of COVID-19 at SAN QUENTIN, and to refuse to facilitate the safe transfer or release of inmates, with deliberate indifference to the rights and safety of inmates, staff, and others;

g.   To refuse and fail to institute, require, and enforce proper physical distancing and face-covering among staff and inmates to reduce the risk of COVID-19 exposure;

h.   To refuse and fail to reduce the prison population at SAN QUENTIN as urgently recommended by public health officials and courts, including the *Von Staich* Court, including but not limited to failing to expedite the release of nonviolent offenders, medically vulnerable inmates, and those with short remaining incarceration terms, with deliberate indifference to the rights and safety of inmates, staff, and others;

i.   To refuse and fail to train inmates and prison staff about public health and proper precautions to protect themselves and prevent the spread of COVID-19 at SAN QUENTIN, with deliberate indifference to the rights and safety of inmates, staff, and others;

j.   To require prison staff to work in unsafe conditions subjecting them to high risk of COVID-19 infection, including requiring certain staff to drive sick inmates known to be infected with Coronavirus to hospitals in close quarters in unsafe vehicles and without proper training, PPE, sanitization, or safety measures, with deliberate indifference to the rights and safety of inmates, staff, and others;

k.   To require prison staff to work in different locations from shift to shift at SAN QUENTIN, thereby spreading Coronavirus to different parts of the prison, with deliberate indifference to the rights and safety of inmates, staff, and others;

l.   To affirmatively choose to engage in the obvious and blatantly unsafe practices described herein and in the "Urgent Memo," OIG reports, *In re Von Staich*, and the Cal-OSHA report, with deliberate indifference to the rights and safety of inmates, staff, and others;

m. To refuse to follow the advice, Orders, and mandates of public health experts and authorities to prevent the spread of COVID-19 at SAN QUENTIN;

n. To refuse and fail to have and enforce necessary, appropriate, and lawful policies, procedures, and training programs to prevent or correct the unconstitutional conduct, customs, and procedures described in this Complaint and in subparagraphs (a) through (m) above, when the need for such was obvious, with deliberate indifference to the rights and safety of Plaintiffs, Decedent, and the public, and in the face of an obvious need for such policies, procedures, and training programs;

o. To cover-up violations of constitutional rights by any or all of the following:

    i. By refusing to provide the OIG with relevant and requested documentation concerning how Defendants created and addressed the COVID-19 outbreak at SAN QUENTIN;

    ii. by failing to properly investigate and/or evaluate complaints or incidents related to the decisions, customs, policies, practices, and procedures described throughout this Complaint and above in subparagraphs (a) through (n);

    iii. by ignoring and/or failing to properly and adequately investigate and discipline unconstitutional, unlawful, and high-risk activity within the CDCR and SAN QUENTIN as described throughout this Complaint and above in subparagraphs (a) through (n);

    iv. by allowing, tolerating, and/or encouraging CDCR and/or SAN QUENTIN personnel to fail to timely, completely, and accurately report information regarding positive COVID-19 tests and cases among inmates and staff at SAN QUENTIN;

    v. by depriving inmates' families of knowledge about their loved one's serious illness with COVID-19; and

    vi. by hiding inmates', including DANIEL RUIZ'S, serious illness, hospitalization, and placement on a ventilator from his family until Defendants knew he was unlikely to survive and would be unable to communicate.

77.     The above-described customs, policies, practices, procedures, and/or official decisions of CDCR and SAN QUENTIN, instituted and overseen by each of the individually-named Defendants, were a moving force and/or a proximate cause of the deprivations of Plaintiffs' and Decedent's constitutional rights, in violation of 42 U.S.C. § 1983, as set forth above in Count One.

78.     Defendants DIAZ, ESTATE OF THARRATT, DAVIS, BROOMFIELD, CRYER, PACHYNSKI, GARRIGAN, ESCOBELL, FAROOQ, TORRES, and DOES 1-20 further failed to properly hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline other individually

named Defendants, DOES 1-20, and other CDCR and SAN QUENTIN personnel under their supervision, with deliberate indifference to Plaintiffs' and Decedent's constitutional rights, which were thereby violated as described above.

79.    The unconstitutional actions, choices and/or conduct of the individually named Defendants, DOES 1-20, and other CDCR and SAN QUENTIN personnel as described above, were approved, tolerated, and/or ratified by policy making officers for CDCR and SAN QUENTIN, including, but not limited to, Defendants DIAZ, ESTATE OF THARRATT, DAVIS, BROOMFIELD, CRYER, PACHYNSKI, GARRIGAN, ESCOBELL, FAROOQ, TORRES, and DOES 1-20.  Plaintiffs are informed and believe, and thereupon allege, the details of this incident have been revealed to the individually named Defendants and DOES 1-20, authorized policy makers within CDCR and/or SAN QUENTIN, and that the individually named Defendants and DOES 1-20 have direct knowledge of the fact that DANIEL RUIZ and similarly situated inmates at SAN QUENTIN were subjected to highly unsafe conditions with risk of COVID-19 and denied necessary care for their serious medical needs with deliberate indifference to their rights and safety.  Notwithstanding this knowledge, each Defendant named in this Count approved of such conduct and decisions by each other and by individuals under their supervision and oversight, and have made a deliberate choice to endorse such conduct and decisions, and the basis for them, which resulted in the death of DANIEL RUIZ.  By so doing, the Defendants named in this Count have shown affirmative agreement with the conduct of other Defendants and other employees/agents under their supervision, and have ratified the unconstitutional acts of such individual Defendants, employees, and agents.

80.    The aforementioned customs, policies, practices, procedures and official decisions; the failure to properly and adequately hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline; and, the unconstitutional orders, approvals, ratification, and toleration of wrongful conduct of Defendants DIAZ, ESTATE OF THARRATT, DAVIS, BROOMFIELD, CRYER, PACHYNSKI, GARRIGAN, ESCOBELL, FAROOQ, TORRES, and DOES 1-20 were a moving force and/or a proximate cause of the deprivations of Plaintiffs' and Decedent's clearly established and well-settled constitutional rights, in violation of 42 U.S.C. § 1983, as more fully set forth above in Count One.

81.     As a direct and proximate result of the foregoing unconstitutional actions, omissions, customs, polices, practices, procedures, official decisions, and improper supervision of Defendants DIAZ, ESTATE OF THARRATT, DAVIS, BROOMFIELD, CRYER, PACHYNSKI, GARRIGAN, ESCOBELL, FAROOQ, TORRES, and DOES 1-20, Plaintiffs sustained serious and permanent injuries and damages and are entitled to damages, penalties, costs, and attorneys' fees, as set forth above, in ¶¶ 71-74, and punitive damages against Defendants DIAZ, ESTATE OF THARRATT, DAVIS, BROOMFIELD, CRYER, PACHYNSKI, GARRIGAN, ESCOBELL, FAROOQ, TORRES, and DOES 1-20 in their individual capacities.

**THIRD CAUSE OF ACTION**
**(VIOLATION OF CIVIL CODE § 52.1 (b))**
**PLAINTIFFS AGAINST DEFENDANTS DIAZ, ESTATE OF THARRATT, DAVIS, BROOMFIELD, CRYER, PACHYNSKI, GARRIGAN, ESCOBELL, FAROOQ, TORRES, AND DOES 1-20**

82.     Plaintiffs re-allege and incorporate by reference the allegations contained in this complaint, as though fully set forth herein.

83.     By their acts, omissions, customs, and policies, Defendants DIAZ, ESTATE OF THARRATT, DAVIS, BROOMFIELD, CRYER, PACHYNSKI, GARRIGAN, ESCOBELL, FAROOQ, TORRES, and DOES 1-20, acting in concert/conspiracy, as described above, and with threat, intimidation, coercion, and/or with reckless disregard for their rights, violated Plaintiffs' and Decedent's rights under California Civil Code § 52.1 and the following clearly established rights under the United States Constitution and California Constitution and law:

    a.  Decedent's right to be free from deliberate indifference to his safety and serious medical needs while in custody as an inmate, as secured by the Eighth Amendment to the United States Constitution and the California Constitution, Article 1, Section 17;

    b.  Decedent's and Plaintiffs' right to be free from wrongful government interference with familial relationships and their right to companionship, society, and support of each other, as secured by the First and Fourteenth Amendments to the United States Constitution;

    c.  Decedent's and Plaintiffs' right to have timely medical information and to make medical decisions for DANIEL RUIZ, and to be able to enjoy their right to familial relationships companionship, society, and support of each other, as secured by Cal Penal Code § 5022 and Cal. Prob. Code §§ 4701 et seq. and 4717;

    d.  The right to enjoy and defend life and liberty; acquire, possess, and protect property; and pursue and obtain safety, happiness, and privacy, as secured by the California Constitution, Article 1, Section 1;

84.    Defendants' violations of Plaintiffs' and Decedent's rights with deliberate indifference in and of themselves constitute violations of the Bane Act.[2] Alternatively, separate from, and above and beyond, Defendants' attempted interference, interference with, and violation of Plaintiffs' and Decedent's rights, Defendants violated Plaintiffs' and Decedent's rights by the following conduct, among other conduct, constituting threat, intimidation, or coercion:

    a.  Intentionally and with deliberate indifference, choosing to place DANIEL RUIZ at a highly increased risk of contracting a deadly communicable disease while he, as an inmate, was powerless to freely act to protect himself and mitigate that risk;

    b.  Intentionally and with deliberate indifference, violating Cal. Pen. Code § 5022 by failing to contact, or allow others to contact, Plaintiffs and DANIEL RUIZ's family when he was seriously ill from COVID-19 at Saint Francis Memorial Hospital and, further, violating Cal. Prob. Code §§ 4701 et seq. and 4717 by failing to allow DANIEL RUIZ to appoint his own surrogate to make medical decisions on his behalf, thereby depriving DANIEL RUIZ and Plaintiffs of their rights to familial association protected by the First and Fourteenth Amendments of the United States Constitution;

    c.  Intentionally and with deliberate indifference, doing and/or permitting subparagraphs (a) – (b) when it was also obvious that in doing so, Decedent's life was likely to end needlessly, and/or that Plaintiffs' rights as Decedent's family also would be violated.

85.    To the extent this claim is based on a violation of Decedent's rights, it is asserted as a survival claim. To the extent that the violations of rights were done to Plaintiffs SANTOS RUIZ, FERNANDO VERA, VANESSA ROBINSON, DANIEL RUIZ, JR, and ANGELINA CHAVEZ, it is asserted as their individual claim. To the extent the violations were done to both Decedent and Plaintiffs, it is asserted as both survival and individual claims.

86.    As a direct and proximate result of the Defendants DIAZ, ESTATE OF THARRATT, DAVIS, BROOMFIELD, CRYER, PACHYNSKI, GARRIGAN, ESCOBELL, FAROOQ, TORRES, and

---

[2] See *Atayde v. Napa State Hosp.*, No. 1:16-cv-00398-DAD-SAB, 2016 U.S. Dist. LEXIS 126639, at *23 (E.D. Cal. Sept. 16, 2016) (citing *M.H. v. Cty. of Alameda*, 90 F. Supp. 3d 889, 899 (N.D. Cal. 2013); see also, *Cornell v. City and County of San Francisco*, Nos. A141016, A142147, 2017 Cal. App. LEXIS 1011 at *58, f.n. 32 (Cal. Ct. App. Nov. 16, 2017) (approving *M.H., supra.*); *Reese v. County of Sacramento*, 888 F.3d 1030, 1043-44 (9th Cir. 2018) (following *Cornell*); *Rodriguez v. County of L.A.*, 891 F.3d 776, 799, 802 (9th Cir. 2018) (following *Cornell*).

DOES 1-20's violation of California Civil Code § 52.1 and of Plaintiff's and Decedent's rights under the United States and California Constitutions and law, Plaintiffs sustained injuries and damages, and against each Defendant named in this Count are entitled to relief as set forth above, in ¶¶ 71-74 and punitive damages against all individual Defendants, and all damages and penalties allowed by California Civil Code §§ 52 and 52.1 and California law, including three times actual damages, and attorneys' fees.

### FOURTH CAUSE OF ACTION
### (VIOLATION OF ADA (Title II) and RA)
### (42 U.S.C. § 12132 & 29 U.S.C. § 794)
### PLAINTIFFS AGAINST DEFENDANTS STATE OF CALIFORNIA, CDCR, AND SAN QUENTIN

87.    Plaintiffs re-allege and incorporate by reference the allegations contained in this complaint, as though fully set forth herein.

88.    Title II of the ADA prohibits discrimination on the basis of disability by public entities, which the Act broadly defines as "any department, agency, special purpose district, or other instrumentality of a State or States or local government[.]"  42 U.S.C. § 12131(1)(B).  Similarly, §504 of the Rehabilitation Act of 1973 proscribes discrimination by "any program or activity[,]" 29 U.S.C. § 794(a), defined as "all of the operations of a department, agency, special purpose district, or other instrumentality of a State or of a local government."  29 U.S.C. § 794(b).  Defendants STATE OF CALIFORNIA, CDCR, and SAN QUENTIN are covered entities for purposes of enforcement of the ADA, 42 U.S.C. §12181(7)(F), and the Rehabilitation Act, 29 U.S.C. § 794, pursuant to the regulations promulgated under each of these laws.  Further, on information and belief, Defendants STATE OF CALIFORNIA, CDCR, and SAN QUENTIN receive federal assistance and funds.  Defendants STATE OF CALIFORNIA, CDCR, and SAN QUENTIN are also within the mandate of the RA that no person with a disability may be "excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity." 29 U.S.C. § 794.

89.    Congress enacted the ADA upon a finding, among other things, that "society has tended to isolate and segregate individuals with disabilities" and that such forms of discrimination continue to be a "serious and pervasive social problem." 42 U.S.C. § 12101 (a)(2).

90.     Title II of the ADA provides: "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Discrimination under the ADA and RA includes not only, *e.g.*, a denial of benefits and services, but also a failure to provide a reasonable accommodation (also known as reasonable modification) for an individual's disability.

91.     Defendants CDCR and SAN QUENTIN are further mandated under the ADA not to utilize standards or criteria or methods of administration that have the effect of discriminating on the basis of disability.  42 U.S.C. § 12182(b)(1)(D)(i).  Discrimination includes "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities."  42 U.S.C. § 12182(b)(2)(A)(ii).

92.     At all material times, as a person with (1) Asthma, (2) Chronic Obstructive Pulmonary Disease ("COPD"), (3) Lipidemia, (4) Hepatitis C, and (5) other known high-risk factors for COVID-19, DANIEL RUIZ was a "qualified individual" with medical impairments that limited and/or substantially limited his ability to care for himself and control his mental, medical, or physical health condition as defined under the ADA, 42 U.S.C. § 12131(2), and under Section 504 of the Rehabilitation Act ("RA") of 1973, 29 U.S.C. § 794, 28 C.F.R. 42.540 (k).  Through their employees and agents, Defendants STATE OF CALIFORNIA, CDCR, and SAN QUENTIN had knowledge of Mr. RUIZ'S disabilities.

93.     As a "qualified [disabled] individual," Defendants STATE OF CALIFORNIA, CDCR, and SAN QUENTIN were required to make reasonable accommodations for DANIEL RUIZ's disabilities and provide access to medical and other appropriate services while he was in custody as an inmate.  DANIEL RUIZ's status as a qualified disabled person also required Defendants STATE OF CALIFORNIA, CDCR, and SAN QUENTIN not to engage in discrimination based on disparate treatment or impact to disabled persons like Mr. RUIZ.

94.     Defendants CDCR and SAN QUENTIN, on behalf of the STATE OF CALIFORNIA, discriminated against DANIEL RUIZ by failing to place him in a setting, and/or failing to provide

appropriate services, to reasonably accommodate his disability and treatment needs. Defendants' failure
to reasonably accommodate DANIEL RUIZ's disabilities in the course of his incarceration caused him to
suffer greater injury and indignity in that process than other non-disabled inmates.

95.     Further, Defendants CDCR and SAN QUENTIN, on behalf of the STATE OF
CALIFORNIA, completely denied DANIEL RUIZ any benefits, medical or other services, or
accommodations for his disabilities, thereby placing him at a more acute risk for contracting COVID-19
and for experiencing more severe symptoms of that deadly virus than non-disabled inmates.

96.     Because of the aforementioned acts and omissions of the individual Defendants and others,
working as employees and/or agents of Defendants STATE OF CALIFORNIA, CDCR, and SAN
QUENTIN, the COVID-19 virus invaded nearly every corner of SAN QUENTIN, leaving DANIEL
RUIZ unable utilize virtually all facilities, programs, and services, including sleeping in his own bed,
without risk of serious harm. Defendants CDCR and SAN QUENTIN failed to reasonably accommodate
DANIEL RUIZ's disabilities as required by law, placing him at risk of contracting a serious
communicable disease for which his disabilities made him highly susceptible to grave harm and death.

97.     Defendants, through their employees and agents, acted as described in this Complaint
despite knowing, at all relevant times, that DANIEL RUIZ was a qualified individual under the ADA and
RA with disabilities that greatly aggravated the risk of serious injury and death if he contracted the
COVID-19 virus.

98.     Further, all of Defendants' actions, choices, and decisions were policies or procedures, or a
product thereof, instituted by Defendants STATE OF CALIFORNIA, CDCR, and SAN QUENTIN that
had a disparate impact on DANIEL RUIZ due to his disabilities, in violation of his rights under the ADA
and RA.

99.     Thus, due to Defendants' failure to reasonably accommodate DANIEL RUIZ's disabilities,
and Defendants' conduct and decisions that had a disparate impact on him and other similarly disabled
individuals, causing Mr. RUIZ to suffer greater injury and indignity than other non-disabled inmates,
Defendants effectively treated non-disabled inmates more favorably than individuals with Mr. Ruiz's
disabilities and high susceptibility to COVID-19.

100.    As a result of the acts and misconduct of Defendants STATE OF CALIFORNIA, CDCR, and SAN QUENTIN complained of herein, DANIEL RUIZ contracted the COVID-19 Coronavirus, suffered immensely, and died, and Plaintiffs have suffered, are now suffering, and will continue to suffer damages and injuries as alleged above.  Plaintiffs sustained serious and permanent injuries and are entitled to damages, penalties, costs, and attorneys' fees as set forth above, in ¶¶ 71-74.  Plaintiffs do not seek punitive damages against Defendants STATE OF CALIFORNIA, CDCR, and SAN QUENTIN.

**FIFTH CAUSE OF ACTION**
**(NEGLIGENCE)**
**PLAINTIFFS AGAINST DEFENDANTS DIAZ, ESTATE OF THARRATT, DAVIS, BROOMFIELD, CRYER, PACHYNSKI, GARRIGAN, ESCOBELL, FAROOQ, TORRES, AND DOES 1-20**

101.    Plaintiffs re-allege and incorporate by reference the allegations contained in this complaint, as though fully set forth herein.

102.    At all material times, Defendants DIAZ, ESTATE OF THARRATT, DAVIS, BROOMFIELD, CRYER, PACHYNSKI, GARRIGAN, ESCOBELL, FAROOQ, TORRES, and DOES 1-20 owed DANIEL RUIZ the duty to act with due care in the execution and enforcement of any right, law, or legal obligation.

103.    At all material times, each Defendant owed DANIEL RUIZ the duty to act with reasonable care.

104.    These general duties of reasonable care and due care owed to DANIEL RUIZ by all Defendants include, but are not limited, to the following specific obligations:

    a.  To maintain humane living conditions for, and provide for the safety and serious medical needs of, DANIEL RUIZ as a state inmate, including taking proper and adequate measures to abate the substantial risk of serious harm posed by exposure to a serious communicable disease;

    b.  To comply with Cal. Pen. Code § 5022, which requires that prison officials obtain and annually update a list of contacts from each inmate, and that prison officials take all reasonable means to contact individuals on an inmate's contact list in the event that inmate becomes seriously ill;

    c.  To comply with Cal. Prob. Code §§ 4701 et seq. and 4717, which protects the right of individuals to give instructions about their own health care, and to appoint a surrogate to make health care decisions on their behalf.

d.   To refrain from abusing their authority granted to them by law; and,

e.   To refrain from violating Plaintiffs' rights guaranteed by the United States and California Constitutions, as set forth above, and as otherwise protected by law.

105.   Defendants, through their acts and omissions, breached the aforementioned duties owed to DANIEL RUIZ and Plaintiffs.

106.   By the acts and omissions set forth more fully in the paragraphs above, Defendants acted negligently and breached their duty of due care owed to DANIEL RUIZ, which foreseeably resulted in death and the suffering of damages by DANIEL RUIZ and Plaintiffs.

107.   As a proximate result of Defendants' negligence, Plaintiffs sustained injuries and damages, and against each listed Defendant in this Count are entitled to the relief described above, in ¶¶ 71-74. Plaintiffs also seek punitive damages against such listed Defendants in their individual capacities.

**SIXTH CAUSE OF ACTION**
**(NAMING OF NOMINAL DEFENDANT UNDER CALIFORNIA LAW)**
**PLAINTIFFS AGAINST NOMINAL-DEFENDANT MONICA RUIZ**

108.   MONICA RUIZ is named herein as a nominal Defendant, because she is not represented by Plaintiffs' counsel, and on information and belief, she is a daughter of Decedent DANIEL RUIZ, may be entitled to bring a claim related to the death of DANIEL RUIZ, and under California law, may be considered a "necessary party" for Plaintiffs' wrongful death claims.  (See *G.M. v. Poole*, CAED No. 2:17-cv-02415-TLN-CKD, 2019 U.S. Dist. LEXIS 156259 *; 2019 WL 4318573 (E.D. Cal. September 12, 2019); *Backer v. United States*, CASE NO. 1:13-CV-1552 AWI-GSA (E.D. Cal. August 29, 2014)). On information and belief, Ms. RUIZ did not present a tort claim to the STATE OF CALIFORNIA pursuant to Government Code § 910 et seq.  Ms. RUIZ, therefore, is named as a nominal Defendant consistent with the stipulation of Plaintiffs and remaining Defendants (Doc. 20), and with Order of this Court (Doc. 22).  Plaintiffs do not believe or claim that MONICA RUIZ is in any way responsible for DANIEL RUIZ's death.

109.   On information and belief, at the time of his death, Decedent DANIEL RUIZ did not have parental rights to any other child besides Plaintiffs SANTOS RUIZ, FERNANDO VERA, VANESSA ROBINSON, and DANIEL RUIZ, JR and Nominal-Defendant MONICA RUIZ.

1

## **<u>REQUEST FOR RELIEF</u>**

2      WHEREFORE, Plaintiffs respectfully request the following relief against each and every

3  Defendant herein except for MONICA RUIZ, jointly and severally:

4
      1.      Declaratory relief, finding that Defendants violated Plaintiffs' and Decedent's rights, to
5  serve the purposes of 42 U.S.C. § 1983, 42 U.S.C. § 12132, 29 U.S.C. § 794, and Cal. Civil
   Code §§ 52 and 52.1, including for vindication of those rights as "Private Attorneys'
6  General," elucidation of those rights for the courts, the public, and government officials,
   and to deter similar wronging by the Defendants and other officials;

7

8
      2.      Compensatory damages in an amount according to proof, which is fair, just, and
   reasonable;

9
      3.      Punitive damages under 42 U.S.C. § 1983, federal law, and California law, in an amount
10  according to proof and which is fair, just, and reasonable against all Defendants except the
   state entity Defendants;

11

12
      4.      All other damages, penalties, costs, interest, and attorneys' fees as allowed by 42 U.S.C. §§
   1983 and 1988; California Code of Civil Procedure §§ 377.20 et seq., 377.60 et seq., and
13  1021.5; California Civil Code §§ 52 et seq., 52.1; and as otherwise may be allowed by
   California and/or federal law;

14
      5.      For such other and further relief as the Court deems just and proper.
15

16      For their claims concerning Nominal-Defendant MONICA RUIZ, Plaintiffs respectfully request

17  that she be accorded the process to which she may be entitled by law, and that after proper service,

18  consistent with California and federal law, any claims she may have against Plaintiffs and/or Defendants

19  and that are related to Plaintiffs' claims herein be either appropriately prosecuted in this action or deemed

20  waived and/or terminated.

21

22

23

24

25

26

27

28

1

## **JURY TRIAL DEMAND**

Plaintiffs hereby respectfully demand a jury trial in this action on all issues so triable, pursuant to Rule 38 of the Federal Rules of Civil Procedure.


Dated: July 7, 2021                                    HADDAD & SHERWIN LLP


                                                       */s/ Michael J. Haddad*_____
                                                       MICHAEL J. HADDAD
                                                       Attorneys for Plaintiff

Dated: July 7, 2021                                    HADDAD & SHERWIN LLP


                                                       */s/ Julia Sherwin*_____
                                                       JULIA SHERWIN
                                                       Attorneys for Plaintiff